# NOTICE: SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
SEPTEMBER 8, 2022

_González, C.J._
CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 97890-5 |
| Respondent, | |
| v. | EN BANC |
| TONELLI ANDERSON, | |
| Appellant. | Filed: September 8, 2022 |

STEPHENS, J.—Tonelli Anderson is serving a 61-year sentence for two first degree murders he committed at age 17. Anderson asks us to hold that his sentence is unconstitutionally cruel in violation of article I, section 14 of Washington's constitution. He argues that this court's recent decision in *State v. Haag*[1] announced a bright line rule that no juvenile offender can ever receive a sentence of 46 years or longer—no matter how serious or numerous their crimes may be—and so his sentence is unconstitutional because it is longer than 46 years. We disagree with Anderson's interpretation of *Haag*.

---

[1] 198 Wn.2d 309, 495 P.3d 241 (2021).

*Haag* is properly understood as announcing that article I, section 14 of Washington's constitution limits the category of juvenile offenders who can receive de facto life without parole (LWOP) sentences, the harshest punishments possible for juvenile offenders under Washington law. In *Haag*, we determined that a particular juvenile offender could not receive such a harsh punishment because his crime reflected youthful immaturity, impetuosity, and failure to appreciate risks and consequences. But when, as here, a juvenile offender's crimes do not reflect those mitigating qualities of youth, Washington's constitution does not bar a de facto LWOP sentence.

The King County Superior Court properly considered all of Anderson's evidence regarding the mitigating qualities of his youth and his rehabilitation while in prison. In light of that evidence and the trial record, the court appropriately determined that Anderson's crimes do not reflect youthful immaturity, impetuosity, or failure to appreciate risks and consequences. Article I, section 14 of Washington's constitution therefore does not prohibit Anderson's 61-year sentence. We affirm.[2]

FACTS

In September 1994, 17-year-old Anderson and his friend, Porshay Austin, went to James Bateman's home to buy cocaine. Austin had purchased drugs from

---

[2] Anderson does not raise, and we do not address, any claims under the Eighth Amendment to the United States Constitution.

2

Bateman twice before. But this time, Anderson and Austin planned to steal Bateman's drugs and to kill him and any witnesses. Austin apparently took the lead.

When Anderson and Austin arrived, they sat in the living room and chatted with Bateman. Bateman's partner, Lynell Ricardos, soon brought out a quarter kilogram of cocaine from a bedroom. She handed the package to Bateman and returned to the bedroom. When Ricardos left the living room, Austin pulled out a handgun and shot Bateman multiple times.

As Austin killed Bateman, Anderson pulled out his own gun and ran down the hallway to the bedroom. There he found Ricardos, Kristin McMullen, and Ricardos's two-year-old son. Anderson shot each of the women twice, killing McMullen and gravely wounding Ricardos. When Ricardos's son grabbed Anderson's leg, Anderson kicked the toddler away. Anderson and Austin fled the scene and locked the door behind them.

Anderson was not immediately apprehended, and he continued to commit serious crimes. In 1995, Anderson was adjudicated guilty of various juvenile offenses and sentenced to a year in juvenile custody. While in juvenile custody, Anderson wrote about his 1994 crimes in letters to girlfriends. *See* Clerk's Papers (CP) at 267-68 ("Remember I told you about that shit me and that [M]exican did down in Kent? Well, it happened again, but this time it happened with Porshay, and we did it for a qua[r]ter kilo of powder! But I messed up and left a witness but they

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

only knew Porshay[']s name!  I think I might [have] left fingerprints, but they haven't c[o]me and charged me."), 269 ("I tell you things that if Porshay found out I told you he'd want me to <u>kill</u> you!  I already have to worry about that bitch Marcy telling someone what Kim told her.  [I]f she does I'll go to the penitent[i]ary for the rest of my life or I can get the death penalty because it was premeditated!").  Anderson even sent his girlfriends photographs of his victims that he had found in a magazine.  CP at 261-62 ("The people in the picture are the people I told you we did that to[]!").

Anderson generally did well in juvenile custody, where he received extensive treatment and opportunities for rehabilitation.  But after his release, Anderson quickly accumulated five adult felony convictions: first degree assault, first degree robbery, unlawful imprisonment, unlawful possession of a firearm, and delivery of cocaine.  While Anderson was serving his sentence for those felonies, the State received an anonymous tip that led investigators to Anderson's inculpatory letters.

The State charged Anderson for the 1994 murders in 1998.  In light of Anderson's youth and the progress he had made while in juvenile custody, the State decided not to charge Anderson with various aggravators that could have justified an exceptional sentence above the standard range.  Those grounds for an exceptional sentence included that there was "a child present when the shooting took place," that the shooting "was designed to hinder law enforcement in the investigation of the

4

killing of James Bateman," that there was "more than one victim in this case," and that Anderson had "uncounted misdemeanor history" and "uncounted juvenile court history that includes violent offenses such as Robbery in the Second Degree." CP at 137. The State also declined to charge Anderson for attempted murder or assault for his shooting of Ricardos, who was left blind in one eye and with a bullet permanently lodged in her head, or for his assault of her son, who still "suffers from mental illness because of what happened . . . at the age that he was." CP at 1; 1 Tr. of Mot. Hr'g (Tr.) at 12.

PROCEDURAL HISTORY

Following a bench trial in 2000, the King County Superior Court convicted Anderson on two counts of first degree murder. At sentencing, Anderson said, "I understand that the victims' families, you know, feel pain, whatever. They expressed it, you know, right here, you know, and—(shrugged shoulders)—I can't say that I'm sorry for anything because I'm still claiming my innocence." CP at 153. Noting that it "would have seriously considered an exceptional sentence up if it had been requested," the trial court imposed the longest sentence available within the standard range: 736 months (just over 61 years). CP at 155. The trial court did not, however, address the potentially mitigating qualities of Anderson's youth. Anderson timely appealed his convictions and sentence, and the Court of Appeals affirmed in

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

an unpublished per curiam opinion. *State v. Anderson*, noted at 111 Wn. App. 1022 (2002).

In 2018, Anderson moved to be resentenced "pursuant to RCW 10.95.030(3)(a)(ii) and *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)." CP at 30. He requested an exceptional sentence below the standard range: 320 months, less than half the length of his original sentence. The State agreed to a resentencing hearing but urged the resentencing court "to re-impose the same sentence of 736 months" because "[n]othing on the record . . . supports a conclusion that the defendant's youth diminished his culpability for these offenses." CP at 111. The King County Superior Court granted Anderson's request for a resentencing hearing.

At the hearing, Anderson argued that "[t]he facts of the case established that he acted with impulsivity and immaturity" and that "[h]e has tried to make himself a better person while in custody." CP at 41. In support of his argument, Anderson submitted three articles that described scientific studies regarding juvenile brain development, though he did not submit the studies themselves. Anderson presented three supportive letters: one stating that "Anderson was a reliable and dependable worker once he settled down and became acclimated to the working environment" in prison, CP at 61, another attesting that "Anderson has been instrumental and consistent with preparing for not only his release but also assisting in the preparation

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

of reentry for fellow prisoners by providing tutoring" since 2016, CP at 62, and another congratulating Anderson for being named to the "President's List" at Walla Walla Community College in 2015, CP at 63. Anderson also provided two dozen certificates of participation, proficiency, completion, recognition, and achievement for various programs he joined while serving his sentence.

Anderson's family testified in support of his request for an exceptional sentence below the standard range. His brother testified that Anderson had grown and changed while in prison. One aunt shared that Anderson's home life was unstable when he was growing up, especially after his mother became addicted to crack cocaine. Another aunt testified that Anderson "as a teenager was stupid. He did some really stupid things. He made a lot of bad decisions. . . . He was a dumb kid. He was young. And he was a follower. He was never a leader." 2 Tr. at 23-24.

Anderson also testified. He apologized for the "pain and suffering" he had caused. 2 Tr. at 24-25. He explained that he "stayed in the streets" as a teenager "to get away from" "the drug traffic . . . [and] the prostitution in and out of [his] house." *Id*. Anderson "hung around the older crowd" and "did a lot of looking up to and trying to mimic some of the behaviors and things that the older guys . . . did." 2 Tr. at 25. He testified that "on the night of September 24, 1994," he "was asked to be a backup on a drug deal" and went "along with it" because he was "trying to make a

7

reputation in the streets." *Id.* Anderson claimed that "street sense kicked in and it was like an automatic response" to go down the hallway to the bedroom and shoot Ricardos and McMullen. 2 Tr. at 26.

Anderson explained that when he arrived at prison, he "was embraced by other gang members" and "started to follow the [gang] hierarchy again." *Id.* But eventually, Anderson "was saved . . . by these older gentlemen that were doing life [sentences] . . . [who] wanted to help . . . younger people become good men." 2 Tr. at 27. "[U]nder their tutelage," Anderson "began to invest [his] time and energy in different programs," including earning "two vocational degrees" and "help[ing] start a non-violence program" in prison. *Id.* Anderson concluded by saying he wanted to express his remorse in order to give his victims and their families closure.

The State urged the resentencing court to reimpose the same sentence of 736 months that was handed down by Anderson's original sentencing court. It relied on the trial court's findings of fact and conclusions of law to argue the facts of the case did not show impulsivity or immaturity: "The findings of the trial court lay bare that this was a planned robbery and execution." CP at 112. These findings, in turn, relied heavily on the inculpatory letters in which Anderson bragged about his murders to various girlfriends. The State also pointed to Anderson's testimony at trial to establish that his crimes in September 1994 were not an aberration but part of a common pattern of criminal behavior that extended before and after this particular

incident. It also presented testimony from Ricardos and the families of Anderson's other victims. In sum, the State argued that the trial record undermined or contradicted Anderson's evidence of rehabilitation and the mitigating qualities of his youth.

The resentencing court conducted a thorough hearing based on a clear understanding of *Miller* and the role the mitigating qualities of youth must play in sentencing a juvenile offender as an adult. The court began its oral ruling by explaining the purpose of a *Miller*-fix resentencing hearing in light of our decision in *State v. Ramos:*[3]

> The *Ramos* court said at a *Miller* hearing the Court must meaningfully consider how juveniles are different from adults, how those differences apply to the facts of the case, and whether those facts present the uncommon situation where a life without parole sentence for a juvenile homicide offender is constitutionally permissible.

2 Tr. at 55. The resentencing judge then described her familiarity with juvenile brain development from her years sitting as a juvenile court judge. The court explained:

> The science of adolescent brain development is significant, it is evolving, and it is important to our understanding. There is no doubt that adolescent brains go through enormous changes that affect impulse control among other things. But courts must consider in this context whether science supports a defendant's position based, as *Ramos*, says, on the facts of the particular case.

2 Tr. at 56. The court acknowledged that most adolescents are not as culpable as adults but determined:

---

[3] 187 Wn.2d 420, 387 P.3d 650 (2017).

9

*State v. Anderson*, No. 97890-5

> This case is not like most. Here we have continuing assaultive criminal behavior after Mr. Anderson committed the crimes in this case, after he reached adulthood, after he had been in a structured environment with treatment at the JRA [(Juvenile Rehabilitation Administration)] and before he was ever charged with these offenses.

*Id.* The resentencing court proceeded to address each of the *Miller* factors in turn.

First, as to impetuosity, the resentencing court acknowledged Anderson's claim that "he acted out of impulse," but it concluded "[a]ll of the evidence that I have seen contradicts that" claim. 2 Tr. at 57. The resentencing court walked through many of the trial court's findings, including that the "robbery and murders were planned in advance." 2 Tr. at 58. The trial court "found beyond a reasonable doubt that [Anderson] killed Ms. McMullen after having an opportunity to deliberate and make a decision to shoot and kill the women after Mr. Bateman was killed." *Id.* Unlike the defendants in *Miller* and *Ramos*, who "committed horrific crimes after having been confronted by a victim," "[n]o one confronted Mr. Austin or Mr. Anderson. They planned and initiated this attack. There was nothing impetuous about it." 2 Tr. at 59.

Second, the resentencing court determined Anderson had not shown that immaturity was a factor in his commission of these murders. The court noted that Anderson was 17 ½ years old and living in his own apartment "with control over his environment" when he committed these crimes. *Id.* "He set up the crime producing setting in this case rather than being victimized by it." *Id.* The resentencing court

10

noted and "appreciate[d] the comments of the strong women here to support Mr. Anderson," expressing that Anderson "had some resources in the community[,] . . . which he didn't take advantage of." *Id.* "He may have been immature, but [the resentencing court did not] have solid evidence of his level of maturity or lack of maturity other than what is in the record before" it. 2 Tr. at 63.

Next, the resentencing court considered whether Anderson appreciated the risks and consequences of his behavior. The court reasoned that Anderson clearly "understood the consequences of his actions because he discussed them in letters." 2 Tr. at 60. Reading excerpts from those letters aloud, the resentencing court emphasized that Anderson admitted the murders were premeditated and had even sent a picture of his victims to girlfriends. "That shows knowledge of consequences and complete lack of remorse." 2 Tr. at 61.

The resentencing court also emphasized that Anderson had never taken responsibility for this crime or several other felonies of which he had been convicted until this resentencing hearing. Yet at his trial, Anderson had "testified to having told Ms. Caldwell that Porshay shot the man in the living room, and he shot the two women in the bedroom, that he didn't finish the job, and one of those women lived, and there was a child in the house." *Id.* These details, which could have been known only by someone who was present at the time of the murders, strongly implicated Anderson. Yet Anderson consistently "denied committing these crimes to the

11

police, in testimony at his trial, at sentencing, and until" the day of his resentencing hearing. 2 Tr. at 62. The resentencing court found that this history of continual denials seriously undermined Anderson's claim that "for the first time in 23 years, he has remorse." *Id.*

Finally, the resentencing court "reviewed the certificates, and many accomplishments that Mr. Anderson has accomplished in prison," including "the classes[ and] the substance abuse treatment." *Id*. The court praised Anderson for his efforts and urged him to "continue[] to be a leader on the things he is currently involved in." 2 Tr. at 63.

Ultimately, the resentencing court determined that—"[o]ther than the comments today from Mr. Anderson and his family"—Anderson presented "no evidence . . . that supports the assertion that Mr. Anderson acted impetuously, was immature, or didn't understand the consequences of his actions at the time" of these murders. *Id*. To the contrary, the resentencing court determined the "facts of this case demonstrate [Anderson's] actions were calculated and premeditated, and that he fully understood the consequences of his actions." CP at 303. This is particularly true in light of the uncharged aggravating circumstances. The resentencing court emphasized "the fact that . . . the murder of Ms. McMullen and the shooting of Ms. Ricardos were designed to hinder law enforcement in the investigation" as one such circumstance showing that Anderson's crimes were thought out, deliberate, and

*State v. Anderson*, No. 97890-5

designed to avoid the consequences of his actions. 2 Tr. at 65. The resentencing

court concluded:

> Pursuant to *State v. Ramos*, the burden of proof is on Mr. Anderson to prove by a preponderance of the evidence transient immaturity at the time of the offense in order to justify an exceptional sentence below the standard sentencing range. I do not find that any such evidence has been presented, nor do I find evidence sufficient to change [Anderson's original] sentence.

*Id.*; CP at 304.

Anderson timely appealed. The Court of Appeals stayed the case pending this

court's decision in *State v. Bassett*.[4] After that stay was lifted in early 2019, the

parties filed their Court of Appeals briefs. A few months later, the State moved to

transfer the appeal to this court. Our commissioner denied the motion without

prejudice but stayed the case again pending our decisions in *State v. Delbosque*[5] and

*State v. Gregg*.[6] When that stay was lifted, our commissioner granted the State's

renewed motion to transfer. Soon after, the State moved to stay this case for a third

time pending our decision in *Haag*. The State also asked this court to order

supplemental briefing by the parties to update the existing briefing, which was

completed in 2019. Our commissioner granted the motion to stay but ruled the

---

[4] 192 Wn.2d 67, 428 P.3d 343 (2018).
[5] 195 Wn.2d 106, 456 P.3d 806 (2020).
[6] 196 Wn.2d 473, 474 P.3d 539 (2020).

13

motion for supplemental briefing was premature. Once *Haag* was decided and the final stay lifted, our clerk directed the parties to file supplemental briefs.[7]

## ANALYSIS

Article I, section 14 of Washington's constitution prohibits cruel punishments. WASH. CONST. art. I, § 14. This court has long held that a punishment is cruel when it is "entirely disproportionate to the seriousness of [the] crimes" for which that punishment is imposed. *State v. Fain*, 94 Wn.2d 387, 402, 617 P.2d 720 (1980) (adopting four-factor disproportionality analysis); *see also State v. Moretti*, 193 Wn.2d 809, 830, 446 P.3d 609 (2019) ("A sentence may also be cruel under article I, section 14 if it is grossly disproportionate to the offense.").

We expanded on this principle in *Bassett*, where we recognized that LWOP sentences are almost always disproportionate punishments for juvenile offenders. 192 Wn.2d at 89. To eliminate "the unacceptable risk that children undeserving of a life without parole sentence will receive one," we announced a categorical bar

---

[7] Anderson's supplemental brief belatedly added a new argument challenging the constitutionality of a statute not at issue in this case. The State moved to strike that new argument, and this court granted the State's motion. Separately, we accepted a joint amici brief from Community Passageways, CHOOSE 180, Rooted ReEntry, Creative Justice, Juvenile Law Center, the Fred T. Korematsu Center for Law and Equality, the American Civil Liberties Union of Washington, Columbia Legal Services, the Washington State Office of Public Defense, King County Department of Public Defense, and TeamChild.

*State v. Anderson*, No. 97890-5

under article I, section 14 prohibiting the imposition of LWOP sentences on all juvenile offenders. *Id.* at 90.

In *Haag*, we expanded our jurisprudence further by recognizing that de facto LWOP sentences are disproportionate punishments for juvenile offenders whose crimes reflect the mitigating characteristics of youth. 198 Wn.2d at 329-30. Relying on a 2016 United States Supreme Court decision, this court determined that Haag's 46-year minimum term sentence "amounts to a de facto life sentence" and that "therefore his sentence is unconstitutional under the Eighth Amendment [to the United States Constitution] because the resentencing court expressly found Haag was 'not irretrievably depraved nor irreparably corrupt.'" *Id.* (quoting the record, and citing *Montgomery v. Louisiana*, 577 U.S. 190, 208, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016)). For the same reasons, we determined that "Haag's de facto life sentence is also unconstitutional under article I, section 14." *Id.* at 330 (citing *Bassett*, 192 Wn.2d at 91).

Anderson argues that *Haag* announced a new categorical bar under article I, section 14, prohibiting any sentence 46 years or longer for any juvenile offender. He reasons that because *Bassett* announced a categorical bar prohibiting LWOP sentences for all juvenile offenders and *Haag* cited *Bassett* when announcing its state constitutional holding, *Haag* must have announced another categorical bar that

*State v. Anderson*, No. 97890-5

applies to all juvenile offenders. But Anderson's interpretation stands in tension with the reasoning of both *Bassett* and *Haag*.

We take this opportunity to clarify that *Haag*'s state constitutional holding recognized a categorical bar prohibiting de facto LWOP sentences for juvenile offenders who have shown that their crimes reflect youthful immaturity, impetuosity, or failure to appreciate risks and consequences. *Id.* at 329-30. Applying this standard to Anderson's case, we hold that the resentencing court appropriately considered Anderson's youthful characteristics and that substantial evidence supports the court's conclusion that Anderson's crimes did not reflect those characteristics. Accordingly, we affirm Anderson's 61-year sentence under article I, section 14 of Washington's constitution.

I.    Under *Haag*, De Facto LWOP Sentences Are Unconstitutionally Cruel Punishments for Juvenile Offenders Whose Crimes Reflect Youthful Immaturity, Impetuosity, or Failure To Appreciate Risks and Consequences

We addressed three questions in *Haag*: (1) whether the resentencing court properly considered Haag's youthfulness, (2) whether Haag's 46-year sentence violated the Eighth Amendment, and (3) whether that sentence violated article I, section 14 of Washington's constitution. 198 Wn.2d at 312-13. We began our analysis with a thorough review of Timothy Haag's resentencing hearing, at which the court "improperly placed *more* emphasis on retribution than on mitigation" in

16

contravention of RCW 10.95.030(3)(b). *Id.* at 323. The resentencing court

determined that "'Haag is not irretrievably depraved nor irreparably corrupt.'" *Id.*

at 313 (quoting record). Yet, despite finding that Haag was not irretrievably

depraved or irreparably corrupt, the resentencing court imposed a long term-of-years

sentence that created a risk that Haag would die in prison or have no meaningful

opportunity to reenter society. *Id.* at 327. In other words, the resentencing court

imposed a de facto LWOP sentence even though Haag's crime reflected youthful

immaturity, impetuosity, and failure to appreciate risks and consequences. *Id.* We

determined that doing so violated both the federal and state constitutions.[8]

The articulation of our state constitutional holding in *Haag* was brief, and

Anderson reads that holding much more broadly than is justified. Applying article

---

[8] Our opinion in *Haag*, like earlier cases, uses the common descriptors from landmark United States Supreme Court cases on juvenile justice, but we take this opportunity to note that some echo archaic notions and fail to capture the constitutional inquiry. Phrases such as "irreparable corruption" and "irretrievably depraved character" wrongly suggest a juvenile offender's innate character determines the constitutionality of their punishment. *Roper v. Simmons*, 543 U.S. 551, 573, 570, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). A more accurate—and less pejorative—description of the constitutional inquiry is one used in *Miller*, which considers the "hallmark features[ of youth, including] immaturity, impetuosity, and failure to appreciate risks and consequences." 567 U.S. at 477. In this opinion, we strive to frame the inquiry under Washington's constitution in these terms. The central question under article I, section 14 is whether and to what extent a juvenile offender's youthful characteristics were a factor in the commission of their crime(s). This is not a binary question; some juvenile offenders will be more influenced by their youthful characteristics than others. Accordingly, sentencing courts must meaningfully consider how, if at all, a juvenile offender's mitigating characteristics of youth affected the commission of their crime(s) to determine whether the juvenile offender is less culpable than an adult who engages in the same behavior.

I, section 14 of Washington's constitution, *Haag* held that de facto LWOP sentences are categorically barred for juvenile offenders whose crimes reflect youthful immaturity, impetuosity, or failure to appreciate risks and consequences. *Id.* at 329-30. Such sentences constitute cruel punishment under article I, section 14 because they are entirely disproportionate to the culpability of those juvenile offenders. This holding flows directly from the singular case on which it is based: *Bassett*.

This court's decision in *Bassett* announced that article I, section 14 of Washington's constitution categorically bars LWOP sentences for juvenile offenders. 192 Wn.2d at 90. We reasoned that because juvenile offenders are usually less culpable than adult offenders and LWOP sentences are uniquely harsher for juveniles than adults, the penological goals of retribution, deterrence, incapacitation, and rehabilitation are generally not served by imposing LWOP sentences on juvenile offenders. *Id.* at 87-89. The mismatch between the lesser culpability of most juvenile offenders and the unique severity of LWOP sentences led us to conclude that the very possibility that a sentencing court could impose an LWOP sentence on a juvenile offender "produces the unacceptable risk that children undeserving of a life without parole sentence will receive one." *Id.* at 90. That risk is constitutionally unacceptable because an LWOP sentence effectively "sentenc[es] a juvenile to die in prison." *Id.* at 87; *see also State v. Sweet*, 879 N.W.2d 811, 837 (Iowa 2016) ("[I]n imposing a sanction akin to the death penalty in some respects,

18

the trial court simply will not have adequate information [about a juvenile offender's

prospects for rehabilitation] and the risk of error is unacceptably high.").

Central to *Bassett*'s reasoning is the fact that an LWOP sentence was, at the

time, the harshest possible punishment for a juvenile offender, given the United

States Supreme Court's invalidation of the death penalty for juvenile offenders. 192

Wn.2d at 88. LWOP sentences are uniquely harsh punishments for juvenile

offenders because a juvenile offender sentenced to LWOP "will 'on average serve

more years and a greater percentage of [their] li[fe] in prison than an adult offender'"

serving an LWOP sentence. *Id.* at 88 (first alteration in original) (quoting *Graham*

*v. Florida*, 560 U.S. 48, 70, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)). In other

words, an LWOP sentence—unlike any other sentence—is inherently harsher for

juvenile offenders than for adult offenders, while the ability to identify those rare

juvenile offenders who merit such punishment is imperfect at best. The court in

*Bassett* therefore determined that "allow[ing] children to be sentenced to the

extremely severe punishment of life without parole" creates an "unacceptable risk"

of cruel punishment under article I, section 14 of Washington's constitution. *Id.* at

87, 90. To eliminate this unacceptable risk, we held that LWOP sentences are

categorically barred for all juvenile offenders.

This reasoning does not readily translate to term-of-years sentences, like the

46-year sentence at issue in *Haag*. Term-of-years sentences are not inherently

*State v. Anderson*, No. 97890-5

harsher for juvenile offenders than for adult offenders—indeed, a juvenile offender serving a term-of-years sentence will be released at a younger age so long as the sentence does not actually exceed their lifetime. And the recognition that any term-of-years sentence may be a de facto life sentence for some offenders, depending on their age, is not related to any unique characteristics of juveniles. Importantly, *Bassett* did not reason that *every* juvenile offender deserves an opportunity for a meaningful life after prison; the court recognized that an LWOP sentence could be permissible for juveniles whose crimes reflect irreparable corruption. *Id.* at 87-88; *cf. Haag*, 198 Wn.2d at 329. However, allowing an LWOP sentence to be an option in the first instance creates too great a risk that juveniles whose crimes reflect youthful immaturity, impetuosity, or failure to appreciate risks and consequences will die in prison. *Bassett*, 192 Wn.2d at 90.

*Haag* rests exclusively on *Bassett* for its state constitutional analysis and must be understood in light of its reasoning. *Haag*, 198 Wn.2d at 330. *Bassett*'s categorical bar reasoning does not speak to term-of-years sentences like Haag's. And *Haag*'s brief state constitutional holding does not explain how *Bassett*'s reasoning could be modified or extended to this different context. *Id.* Therefore, *Haag* cannot be read to draw a bright line prohibiting term-of-years sentences of 46 years or more for all juvenile offenders.

*State v. Anderson*, No. 97890-5

*Haag* must instead be read in line with *Bassett*'s recognition that judicial discretion generally provides the necessary protection against cruel punishments when imposing adult sentences on juvenile offenders—but in the unique context of LWOP sentences, the risk of erroneous judgment is too high. *Bassett*, 192 Wn.2d at 89. This approach follows our steady line of juvenile sentencing decisions holding that the proper exercise of judicial discretion is essential to ensuring that adult sentences imposed on juvenile offenders account for the mitigating qualities of youth. *See, e.g.*, *Moretti*, 193 Wn.2d at 838 (Yu, J., concurring) ("The criminal justice system is not one size fits all. Courts have been entrusted with discretion in sentencing because our society understands that each case is different."). And this approach is more consistent with *Haag*'s own reasoning under the Eighth Amendment. 198 Wn.2d at 329 (holding Haag's "sentence is unconstitutional under the Eighth Amendment because the resentencing court expressly found Haag was 'not irretrievably depraved nor irreparably corrupt'" (quoting the record)). There is no reasoning in either *Haag* or *Bassett* that suggests a 46-year sentence would be impermissible for the rare juvenile offender who is just as culpable as an adult offender.

*Haag* therefore held that article I, section 14 categorically bars de facto LWOP sentences only for those juvenile offenders whose crimes reflect youthful immaturity, impetuosity, or failure to appreciate risks or consequences.

*State v. Anderson*, No. 97890-5

II. Under the Categorical Bar Announced in *Haag*, Anderson's 61-Year Sentence Is Constitutionally Permissible

Applying *Haag* as explained above, we hold that the resentencing court properly exercised sentencing discretion and acted within constitutional limits when imposing Anderson's 61-year sentence.

"'[C]hildren are different'" from adults, so "our criminal justice system [must] address this difference when punishing children" by imposing adult sentences. *In re Pers. Restraint of Ali*, 196 Wn.2d 220, 225, 474 P.3d 507 (2020) (first alteration in original) (quoting *State v. Houston-Sconiers*, 188 Wn.2d 1, 8, 391 P.3d 409 (2017)), *cert. denied*, 141 S.Ct. 1754 (2021). Although most juvenile offenders are less culpable than adult offenders, youth is not a per se mitigating factor that always justifies an exceptional sentence below the standard range when a juvenile offender is convicted of a crime. *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015). Instead, a juvenile offender must show that their immaturity, impetuosity, or failure to appreciate risks and consequences—characteristics of youth that suggest a juvenile offender may be less culpable than an adult offender— contributed to the commission of their crime. *Gregg*, 196 Wn.2d at 480; RCW 9.94A.535(1). Juvenile offenders can satisfy this burden by presenting "'relevant

mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony as appropriate.'" *Haag*, 198 Wn.2d at 321 (internal quotation marks omitted) (quoting *Delbosque*, 195 Wn.2d at 121). At a *Miller*-fix resentencing hearing, that evidence can also include "the measure of rehabilitation that has occurred since a youth was originally sentenced." *Delbosque*, 195 Wn.2d at 121.

When reviewing evidence regarding the mitigating characteristics of youthfulness, sentencing courts must "meaningfully consider how juveniles are different from adults, how those differences apply to the facts of the case, and whether those facts present the uncommon situation where" the juvenile offender is just as culpable as an adult offender. *Ramos*, 187 Wn.2d at 434-35. "'The sentencing court must thoroughly explain its reasoning, specifically considering the differences between juveniles and adults identified by the *Miller* Court and how those differences apply to the case presented.'" *Haag*, 198 Wn.2d at 321 (quoting *Ramos*, 187 Wn.2d at 444). Those differences have to do with the "hallmark features [of youth, including] immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 567 U.S. at 477. While sentencing courts must focus on these mitigating qualities of youth, they must also consider the facts of the particular case, including those that counsel in favor of punishment. *Haag*, 198 Wn.2d at 323 (citing *Ramos*, 187 Wn.2d at 453; *Delbosque*, 195 Wn.2d at 118).

Article I, section 14 of Washington's constitution categorically bars the imposition of de facto LWOP sentences on juvenile offenders whose crimes reflect youthful immaturity, impetuosity, or failure to appreciate risks and consequences. *Id.* at 330 (citing *Bassett*, 192 Wn.2d at 91). So if the sentencing court determines a juvenile offender's crimes reflect those mitigating youthful characteristics, the court cannot impose a sentence that creates an unacceptable risk that the juvenile offender will die in prison or have no meaningful opportunity to reenter society. *Id.*

"'We will reverse a sentencing court's decision only if we find a clear abuse of discretion or misapplication of the law.'" *Id.* at 317 (internal quotation marks omitted) (quoting *Delbosque*, 195 Wn.2d at 116). "'A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds.'" *Id.* (internal quotation marks omitted) (quoting *Delbosque*, 195 Wn.2d at 116). "A decision is based on untenable grounds when its factual findings are unsupported by the record." *Id.* (citing *Delbosque*, 195 Wn.2d at 116). "'We review findings of fact for substantial evidence,' which 'exists when there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.'" *Id.* (internal quotation marks omitted) (quoting *Delbosque*, 195 Wn.2d at 116).

*State v. Anderson*, No. 97890-5

Anderson argues we should reverse his resentencing court's decision because that court failed to consider his youthfulness as a mitigating factor and misapplied the law. We disagree.

### A. The Resentencing Court Meaningfully Considered the Mitigating Qualities of Anderson's Youth in Exercising Its Sentencing Discretion

The resentencing court conducted a thorough hearing and properly considered Anderson's mitigating evidence of youthfulness and rehabilitation in making its decision. The resentencing judge explained her experience in juvenile justice and appreciation that "[t]he science of adolescent brain development is significant, it is evolving, and it is important to our understanding" of the culpability of juvenile offenders. 2 Tr. at 56. The court acknowledged that most adolescents are not as culpable as adults. *Id.* Still, the court determined:

> This case is not like most. Here we have continuing assaultive criminal behavior after Mr. Anderson committed the crimes in this case, after he reached adulthood, after he had been in a structured environment with treatment at JRA, and before he was ever charged with these offenses.

*Id*.

The resentencing court addressed each of the "hallmark features" of youth that are relevant to whether a juvenile offender is as culpable as an adult offender: "immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 567 U.S. at 477. The court observed that Anderson had not produced "solid evidence of his level of maturity or lack of maturity," but that the trial record showed

25

Anderson "set up the crime producing setting in this case rather than being victimized by it," suggesting immaturity had not played a role. 2 Tr. at 63, 59. The court acknowledged Anderson's claim that "he acted out of impulse," but concluded "[a]ll of the evidence that I have seen contradicts that" claim. 2 Tr. at 57. And the court reasoned that Anderson clearly "understood the consequences of his actions because he discussed [those consequences] in letters" sent before Anderson was ever charged with these murders. 2 Tr. at 60. "That shows knowledge of consequences and complete lack of remorse." 2 Tr. at 61. In sum, based on an individualized inquiry the resentencing court determined the "facts of this case demonstrate that [Anderson's] actions were calculated and premeditated, and that he fully understood the consequences of his actions." CP at 303.

Additionally, the resentencing court recognized that the State's charging decisions took Anderson's youth and his efforts while in juvenile custody into account, both in not charging some crimes and in not seeking an exceptional sentence. 2 Tr. at 64-65. These reasons—including "that a child was present, that the murder of Ms. McMullen and the shooting of Ms. Ricardos were designed to hinder law enforcement in the investigation, that there was more than one victim, and that there was uncounted misdemeanor criminal history"—demonstrated that Anderson's culpability vis a vis the standard range sentence was not meaningfully

*State v. Anderson*, No. 97890-5

diminished by the mitigating qualities of his youth.  2 Tr. at 65.  The resentencing

court concluded:

> Pursuant to *State v. Ramos*, the burden of proof is on Mr. Anderson to prove
> by a preponderance of the evidence transient immaturity at the time of the
> offense in order to justify an exceptional sentence below the standard
> sentencing range. I do not find that any such evidence has been presented,
> nor do I find evidence sufficient to change [Anderson's original] sentence.

*Id.*; CP at 304.  In reaching this conclusion, the resentencing court meaningfully and

properly considered the mitigating qualities of Anderson's youth.


B. The Resentencing Court Articulated and Applied the Correct Legal Standard
   When Imposing Anderson's 61-Year Sentence

Notwithstanding the resentencing court's careful reasoning, Anderson argues

that the court misapplied the law by concluding he was "the 'uncommon' child"

whose crimes do not reflect youthful immaturity, impetuosity, or failure to

appreciate risks and consequences.  Am. First Suppl. Br. at 11.  Anderson claims this

court "has consistently stated" that the correct standard is "the 'rare' child who is

irreparably depraved and not simply 'uncommon.'"  *Id.* (citing *Haag*, 198 Wn.2d at

318; *Delbosque*, 195 Wn.2d at 118; *Bassett*, 192 Wn.2d at 89).  This argument

misses the mark.

This court has used "uncommon" and "rare" interchangeably to describe the

small class of juvenile offenders who can be sentenced to harsh adult sentences under

the Eighth Amendment.  *See Ramos*, 187 Wn.2d at 435 (discussing "the uncommon

27

*State v. Anderson*, No. 97890-5

situation where a life-without-parole sentence for a juvenile homicide offender is constitutionally permissible"), 450 (describing "'those rare children whose crimes reflect irreparable corruption'" (quoting *Montgomery*, 577 U.S. at 209)).  So has the United States Supreme Court.  *See Miller*, 567 U.S. at 479-80 ("[G]iven all we have said . . . about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.  That is especially so because of the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (quoting *Roper v. Simmons*, 543 U.S. 551, 573, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005))).[9]

Here, the resentencing court appears to have been quoting directly from our decision in *Ramos* when it stated that "the Court must meaningfully consider how juveniles are different from adults, how those differences apply to the facts of the case, and whether those facts present the uncommon situation" where the juvenile offender's crimes do not reflect youthful immaturity, impetuosity, or failure to

---

[9] Consistent with our recognition that the phrases "irreparable corruption" and "irretrievably depraved" fail to capture the constitutional inquiry, Washington courts should consider the extent to which a juvenile offender's crime reflects youthful immaturity, impetuosity, or failure to appreciate risks and consequences.  If that juvenile offender is the rare child whose crimes do not reflect such youthful characteristics, Washington's constitution does not prohibit the sentencing court from imposing any lawful adult sentence.  *Haag*, 198 Wn.2d at 330.

28

appreciate risks and consequences. 2 Tr. at 55. That was the only time the resentencing court used the word "uncommon" during the resentencing hearing or in its written order. This single reference to the Eighth Amendment standard articulated by this court and the United States Supreme Court was not a misapplication of the law by the resentencing court.

Anderson also argues the resentencing court "erred by not focusing on [Anderson's] immaturity or the transient qualities of youth when it denied" his request for an exceptional sentence below the standard range. Am. First Suppl. Br. at 15. He further suggests the resentencing court failed to "'thoroughly explain its reasoning, specifically considering the differences between juveniles and adults identified by the *Miller* Court and how those differences apply to the case presented.'" *Id.* at 13-14 (quoting *Haag*, 198 Wn.2d at 321). Anderson is incorrect.

As detailed above, the resentencing court fully considered Anderson's proffered mitigation and rehabilitation evidence, and it sustainably found that "none" of his evidence, "[o]ther than the comments today from Mr. Anderson and his family[,] . . . supports the assertion that Mr. Anderson acted impetuously, was immature, or didn't understand the consequences of his actions at the time." 2 Tr. at 63. The resentencing court "address[ed] each of those [Miller] factors individually" and considered how those differences applied to this case. 2 Tr. at 56, 56-59 (impetuosity), 59 (maturity), 59-60 (failure to appreciate the risks and

29

*State v. Anderson*, No. 97890-5

consequences of behavior). The resentencing court determined Anderson did not show that those differences were relevant to his case.

The resentencing court did not improperly place more emphasis on retribution than on mitigation. Unlike in *Haag*, the resentencing court here did not mention retribution a single time during the resentencing hearing. *Haag*, 198 Wn.2d at 323. The resentencing court considered only Anderson's youthfulness, not the youthfulness of his victims. *Id.* The court noted that Anderson's "rehabilitation evidence [is not] voluminous and . . . uncontroverted" like Haag's was. *Id.* at 324. Anderson's mitigation and rehabilitation evidence was comparatively limited. Haag's evidence included testimony from multiple experts opining that he "would have been at a low risk of reoffending at the time of the offense" and "'is currently considered a low risk for reoffending'"—Anderson's evidence did not. *Id.* at 314 (citing and quoting the record) Most importantly, Anderson's mitigation evidence was drastically undermined by other evidence, including the letters to girlfriends in which Anderson bragged about committing the 1994 murders, admitted that they were premeditated, and expressed regret that he had not successfully killed Ricardos and her son before fleeing the scene. CP at 258-74. Moreover, the resentencing court properly rejected Anderson's request for an exceptional sentence below the standard range given that Anderson's conduct would have supported additional

30

charges and aggravating circumstances, which the State did not pursue in light of Anderson's youth.

On this record, the resentencing court did not err by concluding Anderson failed to meet his burden to prove that his crimes reflected youthful immaturity, impetuosity, or failure to appreciate risks and consequences. The resentencing court understood and properly applied the law. Substantial evidence supports the resentencing court's findings. We therefore hold that the resentencing court did not abuse its discretion in finding Anderson failed to meet his burden to justify an exceptional sentence below the standard range. Because Anderson has not proved that the 1994 murders reflected youthful immaturity, impetuosity, or failure to appreciate risks and consequences, Washington's constitution does not forbid his standard range 61-year sentence. *See Haag*, 198 Wn.2d at 330; *Bassett*, 192 Wn.2d at 89-90. Accordingly, we affirm.

CONCLUSION

*Haag* announced a categorical bar against the imposition of de facto LWOP sentences on juvenile offenders whose crimes reflect youthful immaturity, impetuosity, or failure to appreciate risks and consequences. Anderson is not such an individual. Following meaningful consideration of mitigation evidence and the circumstances of Anderson's offenses, the resentencing court properly exercised its

31

*State v. Anderson*, No. 97890-5

discretion when imposing a 61-year sentence on Anderson. Consistent with the

reasoning in *Haag*, we affirm.

Stephens, J.

WE CONCUR:

Johnson, J.

Madsen, J.

Owens, J.

Whitener, J.

32

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Anderson*, No. 97890-5 (González, C.J., dissenting)

No. 97890-5

GONZÁLEZ, C.J. (dissenting) — Even if I could join the majority's repudiation of our recent constitutional jurisprudence, I could not join it in affirming the trial court's resentencing decision here. The resentencing judge abused her discretion by failing to meaningfully consider how juveniles are different from adults, by failing to meaningfully consider how those differences applied to Tonelli Anderson, by failing to consider whether Anderson's case was one of the few where a life without parole sentence is constitutionally permissible, by failing to give meaningful weight to the significant evidence that Tonelli Anderson had rehabilitated himself while in prison, and by improperly allocating the burden of proof to him at resentencing. For all these reasons, I respectfully dissent.

I

Our founding documents promise much to us and require much of us. Among many other things, these founding documents promise due process, equal protection of the law, and freedom from cruel punishments. U.S. CONST. amends.

1

*State v. Anderson*, No. 97890-5 (González, C.J., dissenting)

V, VIII, XIV; WASH. CONST. art. I, §§ 3, 14; THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776). All three branches of government on both the state and federal level, including this very court, have repeatedly failed to keep these promises. *See Price v. Evergreen Cemetery Co. of Seattle*, 57 Wn.2d 352, 357 P.2d 702 (1960) (denying a Black family the statutory right to bury their child in a nearby cemetery), *overruled by Garfield County Transp. Auth. v. State*, 196 Wn.2d 378, 390 n.1, 473 P.3d 1205 (2020); *Leschi v. Wash. Territory*, 1 Wash. Terr. 13, 14 (1857) (upholding Chief Leschi's life sentence and accusing the Nisqually tribe of "sacrific[ing] the lives of so many of our citizens" (later repudiated by a historical court of inquiry as noted in Kelly Kunsch, *The Trials of Leschi, Nisqually Chief*, 5 SEATTLE J. FOR SOC. JUST. 67 (2006))).

We must strive to do better as we know better. This effort is what marks "'the evolving standards of decency that mark the progress of a maturing society.'" *State v. Gregory*, 192 Wn.2d 1, 38, 427 P.3d 621 (2018) (Johnson, J., concurring) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion)).

All too often we have decided that some disfavored group is not due the full protections our founding documents' promise. We have shrugged our robed shoulders at cruelties embodied in law. We know that trial judges in our own state

2

*State v. Anderson*, No. 97890-5 (González, C.J., dissenting)

are more likely to sentence harshly in election years.[1]  So it was with the usually

Black or brown children, like Tonelli Anderson, who were demonized by the war

on crime social panic, racialized fears, and discredited science.[2]  "The

superpredator theory tapped into and amplified racial stereotypes that date back to

the founding of our nation."  *State v. Belcher*, 342 Conn. 1, 17, 268 A.3d 616

(2022). Under its influence, all too many Black and brown children were explicitly

or tacitly classified as "juvenile superpredators" and treated as irredeemable

monsters.  *See State v. Null*, 836 N.W.2d 41, 56 (Iowa 2013) (citing Br. of Jeffrey

Fagan et al. as Amici Curiae in Supp. of Pet'rs at 14-19, *Miller v. Alabama*, 567

U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) (No. 10-9647), 2012 WL

174240).  This myth was based on faulty research and has been thoroughly

repudiated.  *See Belcher*, 342 Conn. at 14-16 (collecting some of the many studies

repudiating the myth of the juvenile superpredator).

---

[1] KATE BERRY, BRENNAN CTR. FOR JUSTICE, HOW JUDICIAL ELECTIONS IMPACT CRIMINAL CASES 2 (2015), https://www.brennancenter.org/our-work/research-reports/how-judicial-elections-impact-criminal-cases [https://perma.cc/64K6-MKQ6].  This study also concluded that the more frequently television ads run during an election, the less likely state supreme court justices are to rule for criminal defendants.  *Id.*

[2] *See generally* Jane Rutherford, *Juvenile Justice Caught Between* The Exorcist *and* A Clockwork Orange, 51 DEPAUL L. REV. 715, 721-22 (2002); Elizabeth R. Jackson-Cruz, Social Constructionism and Cultivation Theory in Development of the Juvenile "Super-Predator" 6 (Mar. 5, 2019) (unpublished M.A. thesis, University of South Florida), https://www.proquest.com/openview/d1158cb2b58a735edd5105794c992c0c/1?pq-origsite=gscholar&cbl=18750&diss=y.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Anderson*, No. 97890-5 (González, C.J., dissenting)

"In 2001, the United States Office of the Surgeon General labeled the superpredator theory a myth." *Id.* at 15 (citing U.S. DEP'T OF HEALTH & HUM. SERVS., YOUTH VIOLENCE: A REPORT OF THE SURGEON GENERAL ch. 1, at 5 (2001), available at https://www.ncbi.nlm.nih.gov/books/NBK44297/?report=reader). Nonetheless, this discredited myth underlies statutes whose effects are still felt today and ring through the majority opinion. Legislative history strongly suggests these myths were on our legislators' minds when they enacted significant changes to the law that resulted in classifying certain children as adults for purposes of charging and sentencing. The language used in bill reports mirrors language used by those who campaigned against the supposed menace of juvenile superpredators. *Compare* H.B. REP. ON H.B. 2319, 53d Leg., Reg. Sess. (Wash. 1994) (using terms like "epidemic" and "tidal-wave" to describe juvenile superpredators), *with* BARRY KRISBERG, JUVENILE JUSTICE: REDEEMING OUR CHILDREN 5-16 (2005) (noting numerous times the myth of the juvenile superpredator was described in similar terms). To his credit, the man who helped popularize the myth of the juvenile superpredator has since recanted and signed briefs to the United States Supreme Court acknowledging his mistake and the harm it caused. *Belcher*, 342 Conn. at 15 n.9.

Sometimes we do the courageous thing and recognize that due process has not been observed, equal protection has not been given, or cruel punishment has

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Anderson*, No. 97890-5 (González, C.J., dissenting)

been imposed. *See Gregory*, 192 Wn.2d at 19 (holding a death penalty statute that is 3.5 to 4.6 times as likely to be imposed on a Black man as a white man is unconstitutional). Sometimes, we abandon bad precedent. *See, e.g.*, *In re Chi-Dooh Li*, 79 Wn.2d 561, 567, 488 P.2d 259 (1971) (holding that a statute that limited bar membership to citizens was unconstitutional and implicitly overruling *In re Takuji Yamashita*, 30 Wash. 234, 239, 70 P. 482 (1902), *disapproved*, 143 Wn.2d xxxiii-lix (2001)[3]). The Connecticut Supreme Court recently directed a man be resentenced because the trial court explicitly relied on the discredited, racist myth that some children are superpredators. *Belcher*, 342 Conn. at 4. Sometimes, the legislature takes steps to rein in past injustices as well. *See* RCW 9.94A.730 (providing a mechanism for early release for some people serving lengthy sentences for crimes committed as children); RCW 13.04.030 (expanding juvenile court jurisdiction); S.B. REP. ON ENGROSSED SECOND SUBSTITUTE S.B. 6160, 65th Leg., Reg. Sess. (Wash. 2018) (documenting testimony that limitations on juvenile court jurisdiction was driven by the repudiated theory of child superpredators).

The United States Supreme Court itself has reined in some of the worst excesses of the demonization of youth during the war on crime by limiting the

---

[3] This court had barred Yamashita from taking the bar exam based on his Japanese ancestry despite being otherwise qualified. *In re Takuji Yamashita*, 30 Wash. at 239. Almost a century later, this court recognized its error and posthumously admitted Yamashita to the bar. Order Posthumously Granting Honorary Admis. To Practice Law in State of Wash., No. 70680-8 (Mar. 1, 2001).

*State v. Anderson*, No. 97890-5 (González, C.J., dissenting)

extraordinary punishments that can be imposed for crimes committed as children. *See Roper v. Simmons*, 543 U.S. 551, 578-79, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (holding the Eighth Amendment forbids imposing the death penalty for crimes committed as a juvenile); *Miller*, 567 U.S. at 465 (holding the Eighth Amendment forbids mandatory life without parole sentences for crimes committed as a juvenile); *see also Montgomery v. Louisiana*, 577 U.S. 190, 206, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016) ("*Miller* announced a substantive rule that is retroactive in cases on collateral review."). Based on our state constitution and our deepening understanding of the mitigating qualities of youth, we went further. We held, categorically, "that sentencing juvenile offenders to life without parole or early release constitutes cruel punishment and therefore is unconstitutional under article I, section 14 of the Washington Constitution." *State v. Bassett*, 192 Wn.2d 67, 73, 428 P.3d 343 (2018). As the opinion I signed in *Haag* recognizes, nothing in *Bassett* restricts its holding to *statutorily* mandatory life without parole sentences. *State v. Haag*, 198 Wn.2d 309, 330, 495 P.3d 241 (2021) ("[I]n *Bassett*, we held that under article I, section 14 of our constitution, *any* life-without-parole sentence for a juvenile offender is unconstitutional." (emphasis added)). *Haag* itself took the reasonable step of applying *Bassett* to de facto life sentences. *Id.* ("Therefore, Haag's de facto life sentence is also unconstitutional under article I, section 14.").

6

*State v. Anderson*, No. 97890-5 (González, C.J., dissenting)

Today, the majority ignores the plain language of both *Bassett* and *Haag* and asserts they mean but shadows of themselves. The majority characterizes *Bassett* as holding that statutorily mandatory life without the opportunity for parole "sentences are *almost* always disproportionate punishments for juvenile offenders." Majority at 14 (emphasis added) (citing *Bassett*, 192 Wn.2d at 89). But there was no "almost" in *Bassett*'s categorical holding about the meaning of our state constitution. The word "almost" is never used in *Bassett*. As my colleagues recognized in *Bassett*, it is the Eighth Amendment that forbids *almost* all life without the possibility of parole sentences for crimes committed as children. 192 Wn.2d at 93 (Stephens, J., dissenting) (citing *Miller*, 567 U.S. 460). Article I, section 14 is more protective of children. *Id.* at 90. Article I, section 14 makes all life without parole sentences imposed for juvenile offenses unconstitutional, regardless of whether they were statutorily mandated. *Id.*

Similarly, the majority characterizes *Haag* as "recognizing that de facto [life without parole] sentences are disproportionate punishments for juvenile offenders *whose crimes reflect the mitigating characteristics of youth*." Majority at 15 (emphasis added) (citing *Haag*, 198 Wn.2d at 329-30). That part of our holding was grounded in the Eighth Amendment. Crucially, however, *Haag* also held that *Bassett*'s article I, section 14 categorical bar on a life without parole sentence for a juvenile offender includes a de facto life sentence. 198 Wn.2d at 330. Indeed, if

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the majority's crabbed reading of the *Haag* opinion was correct, there would have

been no need for a separate holding under article I, section 14 of our state

constitution since the Eighth Amendment already bars imposition of a life sentence

on a juvenile who is not irretrievably depraved or irreparably corrupt. *Id*.; *accord*

*Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 479-80). As *Haag*

recognized, article I, section 14 categorically bars de facto life sentences for crimes

committed as a juvenile regardless of whether a judge has made a finding about

whether the child was irretrievably depraved or irreparably corrupt. 198 Wn.2d at

330 (citing *Bassett*, 192 Wn.2d at 91).

We held that Haag's 46 year sentence amounted to a de facto life sentence

for a juvenile offender "because it leaves the incarcerated individual without a

meaningful life outside of prison." *Id*. at 327. We reasoned that "[a] juvenile

sentenced to be released at the age of 63 has lost incalculably more than an adult in

the same circumstances, the ability to work, to vote, or even to operate a motor

vehicle." *Id*. at 329. Even our colleagues in the dissent understood the majority's

categorical bar and reasoning. *See Haag*, 198 Wn.2d at 337 (Stephens, J.,

dissenting in part) ("the majority . . . decides that a 46-year minimum term

'amounts to a de facto life sentence for a juvenile offender because it leaves the

incarcerated individual without a meaningful life outside of prison'" (quoting

*Haag* majority at 327)). Here, the majority attempts to walk back our holding in

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Haag* by effectively overruling its categorical bar without expressly saying so or showing that it is either incorrect or harmful. *See State v. Pierce*, 195 Wn.2d 230, 240, 455 P.3d 647 (2020) (the court will overrule prior precedent when it is "'incorrect and harmful.'" (internal quotation marks omitted) (quoting *Deggs v. Asbestos Corp. Ltd.*, 186 Wn.2d 716, 727-28, 729, 381 P.3d 32 (2016))).

Make no mistake, the consequences of the majority's decision today will be profound. Before *Miller*, there was no reason for trial judges to decide whether a juvenile being sentenced as an adult was irretrievably depraved or irreparably corrupt, if such a conclusion about the future of a young person is even possible. Not every person serving a long sentence for crimes committed as a child is entitled to a *Miller*-fix resentencing or parole hearing. *See* RCW 9.94A.730; RCW 10.95.035. Anderson himself was not entitled to such a hearing under either statute as his life sentence is merely a matter of fact, not law, and since he had committed crimes after he turned 18. *See* RCW 10.95.035; RCW 9.94A.730(1). That Anderson received a resentencing hearing was effectively an act of prosecutorial grace, not statutory right. I predict few prosecutors will extend such grace in the future.

9

*State v. Anderson*, No. 97890-5 (González, C.J., dissenting)

II

Even if I agreed with the majority that a de facto life sentence was constitutionally permissible for a child, I would reverse because the resentencing judge abused her discretion in several ways.

The resentencing judge abused her discretion by improperly allocating the burden of proof to Anderson. During the hearing, the judge was under the belief that "[p]ursuant to *State v. Ramos*, the burden of proof is on Mr. Anderson to prove by a preponderance of the evidence transient immaturity at the time of the offense in order to justify an exceptional sentence below the standard sentencing range." 2 Tr. of Mot. Hr'g (Apr. 2, 2018) (Tr.) at 65. But the *Miller*-fix statute does not allocate a burden of proof to either party. *State v. Delbosque*, 195 Wn.2d 106, 123-24, 456 P.3d 806 (2020). By placing a burden where it does not lie, the resentencing judge clearly abused her discretion. We should reverse and remand in line with our juvenile jurisprudence. *Id.* at 116 ("We will reverse a sentencing court's decision . . . if we find 'a clear abuse of discretion or misapplication of the law.'" (internal quotation marks omitted) (quoting *State v. Blair*, 191 Wn.2d 155, 159, 421 P.3d 937 (2018))).

While, standing alone, misallocating the burden of proof might have been harmless, the resentencing court clearly abused its discretion by failing to "*meaningfully* consider how juveniles are different from adults, how those

10

differences apply to the facts of the case, and whether those facts present the uncommon situation where a life-without-parole sentence for a juvenile homicide offender is constitutionally permissible." *State v. Ramos*, 187 Wn.2d 420, 434-35, 387 P.3d 650 (2017) (emphasis added). "This means a court 'must do far more than simply recite the differences between juveniles and adults and make conclusory statements that the offender has not shown an exceptional downward sentence is justified.'" *Delbosque*, 195 Wn.2d at 121 (quoting *Ramos*, 187 Wn.2d at 443). Among other things, courts must consider and focus on rehabilitation that has occurred while the petitioner has been serving their sentence. *Haag*, 198 Wn.2d at 321 (quoting *Delbosque*, 195 Wn.2d at 121). Courts must also put great emphasis on mitigating factors. *See, e.g.*, *State v. O'Dell*, 183 Wn.2d 680, 696, 358 P.3d 359 (2015).

Anderson submitted considerable unrebutted evidence he had rehabilitated himself while in prison. Clerk's Papers (CP) at 61-96. He worked as a machine operator and material handler in the license plate shop, a food prep worker, and a payables clerk in the business office, and he received performance ratings of superior or above average from the Department of Corrections. He finished college courses and obtained a certification in bookkeeping and accounting. He completed numerous training programs; trained dogs and tutored offenders; and went through substance abuse treatment, anger management and a nonviolent

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

conflict resolution course. He submitted several certificates documenting his involvement in prosocial activities, such as sports. Anderson's participation in a course titled "Thinking for a Change" was described as an indication of "a willingness to contribute in society with responsibility, to embrace a positive . . . identity, social behavior, beliefs, and to make decisions of a higher moral judgment." CP at 68. The only infraction I can find in the record was for showering without permission in 2016.

The majority suggests that the court concluded that Anderson's rehabilitation evidence was not "'voluminous and . . . uncontroverted'" like Haag's was. Majority at 30 (quoting *Haag*, 198 Wn.2d at 324). I find no such conclusion in this record. The trial court made no finding as to Anderson's rehabilitation under *Haag* because *Haag* had not yet been announced. The closest thing to a conclusion on the rehabilitation evidence is the resentencing court's commendation to Anderson of "well done." 2 Tr. at 62-63. The only reference to rehabilitation in the trial court's findings was regarding the crimes Anderson committed following treatment at the Juvenile Rehabilitation Administration decades ago. CP at 301 (findings of fact (FF) 11). The resentencing judge's approach to rehabilitation is flatly inconsistent with *Haag*, where we held that resentencing courts "'must consider the measure of rehabilitation that has occurred *since* a youth was originally sentenced.'" 198 Wn.2d at 322 (quoting *Delbosque*,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

195 Wn.2d at 121). Instead, the trial court considered only "[Anderson's] age, and . . . whether youth was a factor in the commission of th[e] crime." 2 Tr. at 53.

The trial court simply did not give sufficient weight to the unrebutted evidence of rehabilitation as required by *Haag*, 198 Wn.2d at 321. I would reverse on this basis alone.

Anderson also submitted unrebutted evidence establishing that

even when teenagers' cognitive capacities come close to those of adults, adolescent judgment and their actual decisions may differ from that of adults as a result of psychosocial immaturity. Among the psychosocial factors that are most relevant to understanding differences in judgment and decision making are (a) susceptibility to peer influence, (b) attitudes toward and perception of risk, (c) future orientation, and (d) the capacity for self-management. Whereas cognitive capacities shape the *process* of decision making, psychosocial immaturity can affect decision-making *outcomes*, because these psychosocial factors influence adolescent values and preferences in ways that drive the cost-benefit calculus in the making of choices. In other words, to the extent that adolescents are less psychosocially mature than adults, they are likely to be deficient in their decision-making capacity, even if their cognitive processes are mature.

CP at 53 (Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence, Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psych. 1009, 1012 (2003)).

Anderson presented unrebutted evidence that showed teenagers, as a direct result of their ongoing brain development, are less able to process information quickly and thoughtfully, have less ability to think about the future, are easily influenced by peer pressure, take risks, and have unformed identities as they work

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

out who they are and are therefore less culpable than adults. CP at 45-48, 51-58. The evidence also showed that environmental factors play an overwhelming role in which children commit crimes and which children do not, suggesting that parents who are unable to take their children "off the streets" or "away from temptation" are not successful in reducing juvenile crime. *Id*. at 49.

While the resentencing judge asserted that she was familiar with adolescent brain development "because I sat as a juvenile court judge for four years," 2 Tr. at 55, her conclusory rulings do not give meaningful weight to the mitigating qualities of youth. I am particularly struck by the weight she gave to the fact Anderson lived on his own at the time of the crime. CP at 302 (FF 15,16); 2 Tr. at 59. The resentencing judge treated that as evidence of maturity. 2 Tr. at 59. In my view, treating the fact Anderson was living on his own as evidence of maturity is a profound misinterpretation of the evidence. Anderson grew up in an extraordinarily harsh environment. His main caregiver was addicted to crack cocaine, and his extended family could not intervene or help get him off the streets because they themselves were involved in drug dealing, prostitution, and the criminal justice system. *Id.* at 21-24. Anderson's aunt testified that as a result, he grew angrier as his identity developed. *Id*. at 21. He lived in and out of different homes, had no male role model, and was described as a "follower." *Id*. at 21, 24. In fact, there was evidence that Anderson was the follower and his codefendant,

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

who had visited the victim's home on two prior occasions, was the leader in the shootings. CP at 191. The resentencing judge, however, dismissed the family's agonizing testimony as "bare assertions." *Id.* at 303 (FF 21). Their testimony established Anderson was largely without stability, adult protection, and guidance from a very young age. 2 Tr. at 21-23; *cf. Delbosque*, 195 Wn.2d at 121 ("court[s] must 'receive and consider relevant mitigation evidence bearing on the . . . culpability of the offender, including . . . lay testimony.'" (quoting *Ramos*, 187 Wn.2d at 443)). The fact Anderson was living on his own was a sign of a child thrust into the world far too soon, who was susceptible to peer influence and tragically made horrible decisions, not a sign of maturity.

The resentencing judge also found the fact Anderson wrote to friends about the killings showed he knew what the consequences of committing them were. 2 Tr. at 60-61. Nothing in those letters shows he had sufficient brain development at the time of the crime to make him undeserving of something less than a de facto life sentence.

I am also disturbed with the extent to which the resentencing judge relied on the original sentencing transcript. Not only because resentencing hearings must be "forward-looking," *Haag*, 198 Wn.2d at 323, but because Anderson was a young Black man sentenced, as amicus rightly notes, "during an era rife with racialized media attention to violent crime. In the 1980s and 1990s, headlines emerged

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

depicting inner-city youth as 'hedonistic . . . youngsters from badland neighborhoods who murder, assault, rape, rob, burglarize, deal [. . .] drugs, join [. . .] gangs and create [. . .] disorder.'" Br. of Amici Curiae Cmty. Passageways, CHOOSE 180, Rooted ReEntry, Creative Just., Juv. L. Ctr., the Fred T. Korematsu Ctr. for L. & Equal., the Am. C.L. Union of Wash., Columbia Legal Servs., State Office of Pub. Def., King County Dep't of Pub. Def., and TeamChild at 4 (alterations in original) (internal quotation marks omitted) (quoting Elizabeth R. Jackson-Cruz, Social Constructionism and Cultivation Theory in Development of the Juvenile "Super-Predator" 6 (Mar. 5, 2019) (unpublished M.A. thesis, University of South Florida), https://www.proquest.com/openview/d1158cb2b58a735edd5105794c992c0c/1?pq-origsite=gscholar&cbl=18750&diss=y). Anderson was sentenced against that backdrop. Accordingly, that hearing deserved less weight than the resentencing judge gave it. *Cf. Belcher*, 342 Conn. at 17.

The resentencing judge concluded that Anderson had not proved his crime was the product of transient immaturity. 2 Tr. at 65; CP at 304 (conclusion of law 1). This conclusion is simply not sustainable. Given the situation in which he was living and his enormous growth since then, Anderson established that he is entitled to relief.

16

*State v. Anderson*, No. 97890-5 (González, C.J., dissenting)

The crime Anderson committed was horrible and deserving of significant punishment. The ongoing grief of the victim's families is palpable even in a cold record. 2 Tr. at 29-41. But based on this record, even if a de facto life sentence was constitutionally permissible, the trial court abused its discretion in imposing one in this way. I would reverse and remand for a resentencing hearing consistent with *Delbosque* and *Haag*.

More importantly, the majority rewrites our jurisprudence to profoundly limit the protection we have found our state constitution gives to children without showing that those decisions should be overruled. I would hold under the categorical bars announced in *Bassett* and *Haag*, a 61 year sentence for crimes committed as a juvenile is not constitutional and thus Anderson is entitled to resentencing. Accordingly, I respectfully dissent.

González, C.J.

Gordon McCloud, J.

Montoya-Lewis, J.

17

*State v. Anderson*, No. 97890-5
(Yu, J., concurring in dissent)

No. 97890-5

YU, J. (concurring in dissent) — I agree with the dissent that Tonelli

Anderson is entitled to resentencing pursuant to this court's precedent, which

recognizes "that life is more than just life expectancy and that a juvenile must have

a meaningful opportunity to rejoin society after leaving prison." *State v. Haag*,

198 Wn.2d 309, 328, 495 P.3d 241 (2021).  I write separately to elaborate on the

ways in which the majority undermines our precedent, ignores fundamental

principles of stare decisis, and disregards this court's own call to "recognize the

role we have played in devaluing [B]lack lives."  Letter from Wash. State Sup. Ct.

to Members of Judiciary & Legal Cmty. at 1 (June 4, 2020),

https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20

News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf

[https://perma.cc/QNT4-H5P7].  Today's decision is contrary to both long-

established principles of law and newly recognized principles of justice.  I

therefore respectfully concur in the dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

State v. Anderson, No. 97890-5
(Yu, J., concurring in dissent)

BACKGROUND

In 2000, Anderson was sentenced to a prison term of 736 months—over 61 years—for homicide offenses he committed when he was 17 years old. Anderson is unlikely to survive his sentence, "given the shortened life expectancy and compromised health associated with life in prison." *Haag*, 198 Wn.2d at 329 (citing Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 Am. J. Pub. Health 523, 523 (Mar. 2013)). If he manages to beat the odds, Anderson will be in his 80s when he is released. Wash. Sup. Ct. oral argument, *State v. Anderson,* No. 97890-5 (Feb. 10, 2022), at 9 min., 45 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

A person can accomplish great things between their 80th birthday and the end of their life. However, if that person has spent the previous six decades in prison, they will certainly have "miss[ed] out on the developments of the world," and "will inevitably fall behind." *Haag*, 198 Wn.2d at 327. Anderson's sentence thus "deprives him of a meaningful opportunity to return to society, depriving him of a meaningful life." *Id.* at 329. In accordance with our precedent, there can be no question that Anderson's original 61-year sentence "amounts to a de facto life sentence for a juvenile." *Id.* at 317.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

When Anderson was resentenced in April 2018, the resentencing court had the benefit of our decision in *State v. Ramos*, which analyzed the "minimal federal constitutional requirements" that apply when sentencing a juvenile homicide offender. 187 Wn.2d 420, 450, 387 P.3d 650 (2017). However, *Ramos* explicitly "decline[d] to engage in an independent state constitutional analysis." *Id.* at 453. Later decisions of this court concluded that additional protections are required as a matter of independent state law, as discussed further below. However, those opinions were issued after the resentencing court in this case concluded that Anderson had not provided "evidence sufficient to change [the original] sentence." 2 Tr. of Mot. Hr'g (Apr. 2, 2018) at 65. Thus, Anderson remains subject to the same de facto life sentence he was given in 2000.

The resentencing court committed multiple errors in evaluating the evidence Anderson presented, as described by the dissent. *See* dissent at 10-16. However, those discrete errors are irrelevant in light of this court's controlling precedent, which categorically holds that "under article I, section 14 of our constitution, *any* life-without-parole sentence for a juvenile offender is unconstitutional." *Haag*, 198 Wn.2d at 330 (emphasis added) (citing *State v. Bassett*, 192 Wn.2d 67, 91, 428 P.3d 343 (2018)). Therefore, Anderson's "de facto life sentence is also unconstitutional under article I, section 14." *Id.* The majority's decision to the contrary is unsupportable and indefensible.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ANALYSIS

Six months after Anderson was resentenced, we decided *Bassett*, a landmark decision of Washington constitutional law in the area of juvenile sentencing. *Bassett* conducted a meticulous analysis pursuant to *State v. Gunwall*,[1] and held for the first time that "[t]he six *Gunwall* factors all direct us toward interpreting article I, section 14 more broadly than the Eighth Amendment. Thus, we h[e]ld that in the context of juvenile sentencing, article I, section 14 provides greater protection than the Eighth Amendment." 192 Wn.2d at 82; U.S. CONST. amend. VIII.

Next, we carefully analyzed whether Bassett's article I, section 14 challenge to his life-without-parole (LWOP) sentence should be reviewed in accordance with "our traditional *Fain*[2] proportionality analysis" for individual "claims that a sentence was grossly disproportionate," or if we should instead apply a "categorical bar analysis . . . based on the nature of the juvenile offender class." *Id.* at 82-83. To make this determination, we considered the nature of Bassett's claim, which was "a categorical challenge based on the characteristics of the offender class—children," as well as the purposes underlying the *Fain* proportionality test and the categorical bar analysis. *Id.* at 83. Based on this analysis, the court concluded that "though we have adopted *Fain* to assess other

---

[1] 106 Wn.2d 54, 720 P.2d 808 (1986).
[2] *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980).

4

*State v. Anderson*, No. 97890-5
(Yu, J., concurring in dissent)

cruel punishment claims under our state constitution, it is inappropriate to assess

Bassett's categorical challenge." *Id.* at 85. As a result, *Bassett* adopted the

categorical bar analysis to apply where a former juvenile offender brings a

"categorical challenge" to their life sentence pursuant to article I, section 14, based

on the "characteristics of youth." *Id.*

Finally, because *Bassett* adopted a categorical analysis, its central holding

announced a categorical rule: "[S]entencing juvenile offenders to life without

parole or early release is cruel punishment." *Id.* at 90. "[C]ruel punishment" is

explicitly prohibited by article I, section 14 of the Washington Constitution. As a

result, RCW 10.95.030(3)(a)(ii), which purports to permit (but not require) life-

without-parole sentences for juvenile homicide offenders, "is unconstitutional

under article I, section 14." *Id.*

The majority mischaracterizes *Bassett*'s clear and unequivocal holdings. As

the dissent correctly notes, "there was no 'almost' in *Bassett*'s categorical holding

about the meaning of our state constitution." Dissent at 7. *Contra* majority at 14.

In addition, the majority incorrectly asserts that *Bassett* "recogni[zed] that judicial

discretion generally provides the necessary protection against cruel punishments

when imposing adult sentences on juvenile offenders," with life without parole

being a "unique" exception. Majority at 20-21 (citing *Bassett*, 192 Wn.2d at 89).

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

It is true that the "extremely high stakes" of LWOP sentences were relevant to *Bassett*'s specific holding striking down RCW 10.95.030(3)(a)(ii). 192 Wn.2d at 90. However, everything *Bassett* said about "the imprecise and subjective judgments a sentencing court could make" when assessing a juvenile offender's "'diminished culpability and heightened capacity for change'" applies equally to any proceeding in which a person is sentenced in adult court for offenses committed as a juvenile. *Id.* at 89 (internal quotation marks omitted) (quoting *Ramos*, 187 Wn.2d at 444). As a result, "sentencing courts must have complete discretion to consider *mitigating* circumstances associated with the youth of any juvenile defendant," and article I, section 14 limits judicial discretion by prohibiting Washington courts from sentencing any juvenile offenders to "liv[e] out the rest of their lives in prison." *State v. Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017) (emphasis added); *Bassett*, 192 Wn.2d at 90.

Thus, contrary to the majority's analysis, *Bassett* strongly supports Anderson's claim that his 61-year sentence is categorically prohibited by article I, section 14. Nevertheless, the majority is correct insofar as it recognizes that *Bassett* does not directly control here because *Bassett* struck down only *literal* life sentences for juvenile offenders. We were not presented with, and therefore did not address, the constitutionality of *de facto* life sentences for juvenile offenders until three years later, when *Haag* held as a matter of independent state law that

6

State v. Anderson, No. 97890-5
(Yu, J., concurring in dissent)

"*any* life-without-parole sentence for a juvenile offender is unconstitutional." 198 Wn.2d at 330 (emphasis added). Therefore, we held that article I, section 14 categorically bars "de facto life sentence[s]" for juvenile offenders. *Id.*

Like our decision in *Bassett*, *Haag*'s unambiguous holding was based on a thorough and reasoned analysis. The court first concluded that Haag's 46-year minimum term "amounts to a de facto life sentence for a juvenile offender because it leaves the incarcerated individual without a meaningful life outside of prison." *Id.* at 327. *Haag* next correctly recognized that "in *Bassett*, we held that under article I, section 14 of our constitution, *any* life-without-parole sentence for a juvenile offender is unconstitutional." *Id.* at 330 (emphasis added) (citing *Bassett*, 192 Wn.2d at 91). We therefore concluded that "Haag's de facto life sentence is also unconstitutional under article I, section 14." *Id.*

The majority is thus either mistaken or dishonest in its claim that *Haag* "recognized a categorical bar prohibiting de facto LWOP sentences [only] for juvenile offenders who have shown that their crimes reflect youthful immaturity, impetuosity, or failure to appreciate risks and consequences." Majority at 16. That is the holding of *Ramos*, which was based on federal law. 187 Wn.2d at 439-40. It is not the independent state law holding of *Haag*.

It is true that in addition to adopting a categorical bar, *Haag* held that the "resentencing court clearly misapplied the law because it emphasized retribution

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

over mitigation," thus acting contrary to the legislature's intent by failing to "highlight[ ] the very factors of mitigation that our legislature and this court have identified as paramount." 198 Wn.2d at 321, 326. However, this part of our analysis was explicitly intended to "provide guidance to resentencing courts." *Id.* at 326. It was analytically independent of *Haag*'s holding that article I, section 14 categorically bars de facto life sentences for *all* juvenile offenders. *Id.* at 330. *Contra* majority at 16.

The majority is also either mistaken or dishonest in its view that *Haag* "does not explain how *Bassett*'s reasoning could be modified or extended to this different context." Majority at 20. To the contrary, *Haag* explained in great detail its reasons for extending *Bassett*'s categorical bar to de facto life sentences, recognizing that "'the concept of "life"'" cannot be reduced to mere "'biological survival,'" and that "'an individual is effectively incarcerated for "life" if [they] will have no opportunity to truly reenter society or have any meaningful life outside of prison.'" 198 Wn.2d at 327 (quoting *Casiano v. Comm'r of Corr.*, 317 Conn. 52, 78, 115 A.3d 1031 (2015)). We explicitly held that a "46-year sentence for Haag results in his losing meaningful opportunities to reenter society and to have a meaningful life" and thus constituted a de facto life sentence. *Id.* No less can honestly be said of Anderson's 61-year sentence.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

By thus distorting our precedent beyond recognition, today's majority "effectively overrul[es] [*Haag*'s] categorical bar without expressly saying so or showing that it is either incorrect or harmful." Dissent at 9 (citing *State v. Pierce*, 195 Wn.2d 230, 240, 455 P.3d 647 (2020)). If a majority of this court now believes that our "prior decision is so problematic that it *must* be rejected, despite the many benefits of adhering to precedent," then it should have the courage to say so and the integrity to provide a reasoned analysis in support. *State v. Otton*, 185 Wn.2d 673, 678, 374 P.3d 1108 (2016). Instead, the majority resorts to "rewrit[ing] our jurisprudence to profoundly limit the protection we have found our state constitution gives to children," while disingenuously claiming to "clarify" the law. Dissent at 17; majority at 16. In fact, by disregarding both our precedent and the stare decisis considerations supporting it, the majority causes confusion and invites further litigation attempting to undermine settled law.

"The majority's cavalier approach to overturning this [c]ourt's precedents" without acknowledgement or justification is directly contrary to the "judicial modesty and humility" required by the doctrine of stare decisis. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. ___, 142 S. Ct. 2228, 2319, 213 L. Ed. 2d 545 (2022) (Breyer, Sotomayor, and Kagan, JJ., dissenting). Moreover, the majority's inaccurate assertions about our precedent threaten the "'the actual and perceived integrity of the judicial process,'" one of the core values stare decisis is intended to

9

protect. *Id.* at 2320 (quoting *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991)); *see also State v. Barber*, 170 Wn.2d 854, 863, 248 P.3d 494 (2011).

All of this would be reason enough to dissent. However, there is an additional, deeply troubling aspect of the majority's decision in this case that must be acknowledged.

*Bassett* and *Haag* treated the former juvenile offenders before the court as precisely that—former *juvenile* offenders. We concluded that Brian Bassett's and Timothy Haag's crimes, though unquestionably horrific, did not justify the State in depriving them of any chance to have a meaningful life outside of prison walls. Both decisions were based on considerations of the many ways in which "children are different for sentencing purposes," including their "'diminished culpability and heightened capacity for change.'" *Haag*, 198 Wn.2d at 329; *Bassett*, 192 Wn.2d at 89 (internal quotation marks omitted) (quoting *Ramos*, 187 Wn.2d at 444).

The majority goes to great lengths to avoid giving Anderson the same consideration, refusing to apply controlling precedent, as discussed above, and drawing false distinctions between the evidence presented at Anderson's resentencing hearing and the evidence presented in other cases, as discussed in the dissent. *See* dissent at 12-17. However, the majority conspicuously fails to mention one additional factor distinguishing *Bassett* and *Haag* from *Anderson*.

10

*State v. Anderson*, No. 97890-5
(Yu, J., concurring in dissent)

Bassett and Haag are both white. *State v. Bassett* (Wash. Ct. App. No. 47251-1-II (2015)), Clerk's Papers (CP) at 140; *State v. Haag* (Wash. Ct. App. No. 51409-5-II (2018)), CP at 41, 765. Anderson is Black. CP at 168. Bassett and Haag were both recognized by this court as former juvenile offenders capable of redemption and rehabilitation, and they were ordered to be resentenced accordingly. Anderson has been denied any such recognition and resentencing, contrary to the law and the evidence. I do not suggest that the majority is knowingly or intentionally discriminating against Anderson on the basis of his race. However, it is only by "develop[ing] a greater awareness of our own conscious and unconscious biases" that we can hope to move forward. Letter from Wash. State Sup. Ct., *supra*, at 1. In this case, it would be willfully oblivious to conclude that race has played no role in the dramatically inconsistent treatment given to these three former juvenile offenders by our court system.

"[I]t is well established by empirical literature and has been acknowledged by [this court] that Black children are prejudiced by, in addition to other stereotypes, 'adultification,' or the tendency of society to view Black children as older than similarly aged youths." *In re Pers. Restraint of Miller*, 21 Wn. App. 2d 257, 265, 505 P.3d 585 (2022); *see* GENDER & JUST. COMM'N, WASH. CTS., 2021: HOW GENDER AND RACE AFFECT JUSTICE NOW 452-53 & nn.96-97 (2021). One result of this adultification bias is that "juvenile offenders of color are seen as more

11

*State v. Anderson*, No. 97890-5
(Yu, J., concurring in dissent)

blameworthy and deserving of harsher punishment" than their white counterparts.

2021: HOW GENDER AND RACE AFFECT JUSTICE NOW, *supra*, at 453.

Viewed in this light, the otherwise-inexplicable inconsistencies between Bassett's and Haag's cases, on one hand, and Anderson's case, on the other, raise serious concerns. To provide one striking example, as the dissent notes, the resentencing court here viewed "the fact Anderson lived on his own at the time of the crime . . . as evidence of maturity." Dissent at 14; *see* CP at 302 ("There is no evidence that defendant lacked maturity, or that any lack of maturity mitigated his culpability for these crimes. . . . He was living on his own, with control over his own environment."). When such reasoning was applied to Brian Bassett at his resentencing, this court highlighted it as "an illustration of the imprecise and subjective judgments a sentencing court could make regarding transient immaturity and irreparable corruption." *Bassett*, 192 Wn.2d at 89. In stark contrast, the majority today concludes that in applying the *exact same reasoning* to Tonelli Anderson, "the resentencing court meaningfully and properly considered the mitigating qualities of Anderson's youth." Majority at 26.

There can be no doubt that "adultification is real and can lead to harsher sentences for children of color if care is not taken to consciously avoid biased outcomes." *Miller*, 21 Wn. App. 2d at 267. The majority today fails to take such care, leading to a harsh result for a former juvenile offender who is Black, which is

12

*State v. Anderson*, No. 97890-5
(Yu, J., concurring in dissent)

irreconcilable with more lenient results obtained by former juvenile offenders who are white. We are not asked to decide in this case whether such inequitable treatment justifies applying a standard of "presumptive prejudice to juvenile resentencing cases" involving youth of color. *Id.* at 265. However, the majority opinion today indicates that such a presumption may prove necessary in the future.

Although this court has made great strides and has much to be proud of, we must never forget "the shameful legacy we inherit." Letter from Wash. State Sup. Ct., *supra*, at 2. This is the court that once routinely affirmed criminal convictions of Native people for lawfully exercising their treaty-protected fishing rights, issuing opinions that were "supported in theory by ingenious reasons and excuses" but "based in fact upon the strength of the violator and the weakness of the violated." *State v. Meninock*, 115 Wash. 528, 534, 197 P. 641 (1921) (Mackintosh, J., dissenting), *abrogated by State v. Towessnute*, 197 Wn.2d 574, 486 P.3d 111 (2020). These opinions should be a sobering reminder that sometimes the State— and this court—can be "the violator."

This is also the court that once held a white couple in publicly assisted housing had a constitutional right to "refuse[ ] to sell their home to complainant because of his color" because others who did not live in publicly assisted housing were "at perfect liberty to do" so. *O'Meara v. Wash. State Bd. Against Discrimination*, 58 Wn.2d 793, 795, 799, 365 P.2d 1 (1961) (plurality opinion).

13

*State v. Anderson*, No. 97890-5
(Yu, J., concurring in dissent)

The legislature responded by prohibiting racial discrimination in *all* real estate transactions, thus recognizing what our court refused to see: "Few state interests are more compelling than those surrounding the eradication of social disparity created by racial discrimination." *Voris v. Hum. Rts. Comm'n*, 41 Wn. App. 283, 290, 704 P.2d 632, *review denied*, 104 Wn.2d 1018 (1985) (upholding constitutionality of former RCW 49.60.222 (1977)).

The majority fails to apply the lessons from our past to the case now before us. As a result, today's opinion will "continue to perpetrate injustice by [its] very existence" until it is one day rejected by jurists and lawmakers as a "historical injustice[ ]." *Towessnute*, 197 Wn.2d at 575. That day may not come for many years, and the path we will take to get there is not yet clear. But it will come.

CONCLUSION

"Hope is a crushed stalk / Between clenched fingers. Hope is a bird's wing / Broken by a stone. . . . Hope is a song in a weary throat. *Give me a song of hope /And a world where I can sing it*." PAULI MURRAY, *Dark Testament*, verse 8, *in* DARK TESTAMENT AND OTHER POEMS 2, 13 (1970). Though I am dismayed by the court's walk back, I maintain hope that Anderson and other juveniles who have been wronged by today's decision will someday obtain the relief to which they are constitutionally entitled. I respectfully concur in the dissent.

*State v. Anderson*, No. 97890-5
(Yu, J., concurring in dissent)

_____
Yu, J.

_____
Montoya-Lewis, J.